**MALJAMAR OIL & GAS CORPORATION v.
MALCO REFINERIES, Inc., et al.**

No. 3251.

Circuit Court of Appeals, Tenth Circuit.

May 11, 1946.

674

Bryan G. Johnson, of Albuquerque, N. M., and Paul Carrington, of Dallas, Tex. (Iden & Johnson, of Albuquerque, N. M., and John E. Kilgore, Joe C. Stephens, Jr., George W. Schmucker, and Carrington, Gowan, Habberton, Johnson & Walker, all of Dallas, Tex., on the brief), for appellant.

J. O. Seth, of Santa Fe, N. M. (Seth & Montgomery, of Santa Fe, N. M., on the brief), for appellee Malco Refineries, Inc.

H. A. Kiker and Manuel A. Sanchez, both of Santa Fe, N. M., for appellees Murchison & Co. and Ernest Closuit.

Before BRATTON, HUXMAN and MURRAH, Circuit Judges.

HUXMAN, Circuit Judge.

Malco Refineries, Inc.,[1] instituted a declaratory judgment action against Maljamar Oil and Gas Corporation[2] and Murchison and Closuit, Inc.[3] in the United States District Court for the District of New Mexico, seeking a declaratory judgment defining and establishing the rights and liabilities of the respective parties under certain contracts between them relating to the production, transportation and purchase of oil products, as will more specifically appear hereinafter.

Malco is a New Mexico corporation. It owns and operates a refinery at Artesia, New Mexico. Maljamar is a Delaware corporation. It owns producing oil properties near Artesia, New Mexico. Murchison is, or was, a Delaware corporation, and the substituted defendant, Murchison & Co., is a Delaware company, and the substituted defendant, Ernest Closuit, is a citizen of Texas.[4] Murchison constructed a pipe line running from Maljamar's wells to Malco's Refinery. At all times up to December 30, 1941, Malco and Maljamar were controlled by the same group through common stock ownership.

On April 9, 1934, a contract was executed between Grayberg Oil Co. and Maljamar as first parties, Malco as second party, and Murchison as third party,[5] in which Maljamar agreed to deliver to Murchison, to be transported or carried by it to Malco's Refinery all the oil produced from Maljamar's properties, as set out in the contract, for a period of ten years from the date of receipt of notice from Murchison that its pipe line had been completed. It was provided that all oil produced by Maljamar should be transported only through Murchison's pipe line, providing, however, that Maljamar reserved the right to dispose of any excess production over Malco's requirements otherwise than through Murchison's pipe line unless Murchison first exercised an option given to it in the contract to purchase such

---

[1] Herein called Malco.

[2] Herein called Maljamar.

[3] Herein called Murchison.

[4] Murchison and Closuit, Inc., Murchison & Company and Ernest Closuit will be referred to herein as Murchison.

[5] This contract will be referred to as the base contract. It contained many provisions not involved in the controversy and in the interest of clarity only those terms will be recited which are essential to the controversy. Grayberg Oil Company is not involved in this litigation and no further reference will be made to it.

excess oil at such price as the oil was offered to other parties, but not more than the Hobbs posted field price. The contract fixed the transportation charges due Murchison but was silent as to the price which Malco was required to pay Murchison for the oil.

On July 28, 1938, a supplemental contract was executed between Malco and Murchison which, so far as material, extended the term of the base contract for an additional five years. Maljamar did not join in the execution of this contract, but on July 11, 1940, it executed a supplemental contract with Malco and Murchison in which it ratified the extension of the base contract for five years. The above contracts were all executed while Malco and Maljamar were under common ownership. On December 29, 1941, the owners of Malco and Maljamar, by written contract, sold Malco to Anderson and Lubell. In this contract Maljamar agreed to execute a contract for the sale of its production to Malco on the same price basis and terms as contained in the base contract. In fulfillment of this obligation Maljamar executed a contract December 30, 1941, in which it agreed to sell all its production to Malco from the date of the contract to December 31, 1951, subject to the contracts of April 9, 1934, July 28, 1938, and July 11, 1940. Up to this point, none of the contracts specifically fixed the price Malco was to pay Maljamar for the oil purchased thereunder.

On December 30, 1941, Maljamar wrote the following letter to Malco:

"December 30, 1941.
"Malco Refineries, Inc., Artesia, New Mexico.
"Gentlemen: Confirming conversation with you, it is mutually understood between us, with reference to the crude oil contracts with you, that you will continue to pay for such crude oil as you buy from us out of the Maljamar pool on the same price practices as heretofore in vogue. This is not intended to alter or amend the existing contracts in any way.
"Kindly indicate by your signature below your assent to this understanding.
"Very truly yours,
"Maljamar Oil & Gas Corporation,
"By M. E. Baish, V. Pres.

"Accepted:
"Malco Refineries, Inc.
"By Robert O. Anderson, V. Pres. & Sec."

This was the first time the price which Malco was obligated to pay was specifically mentioned in any writing. Thereafter the parties continued to operate as before. Maljamar delivered its oil production to Malco through Murchison's pipe line and received payment therefor on the basis of the posted price for thirty-six degree gravity oil. On June 13, 1944, Maljamar notified Malco that it would continue to sell it oil under the contract set out above only until August 31, 1944. Thereupon Malco instituted this action asking the court to declare its rights and define Malco's obligations under the contracts set out above.

The gist of the controversy between Malco and Maljamar is the price which Malco was required to pay for the oil which it purchased from Maljamar. It is Malco's position that the agreements between them, as evidenced by the continued practices from the date of the base contract, and as further evidenced by the letter of December 30, 1941, required it to pay the posted price for oil of thirty-six degree gravity, irrespective of the actual test of the oil. On the other hand, Maljamar contends that no binding contracts had been executed between it and Malco which required Malco to purchase its requirements from Maljamar or which provided that the oil which was purchased should be paid for at the posted price for thirty-six degree gravity oil. It further contends that Malco is required to pay the posted price on the actual gravity of the oil.

The pleadings presented other issues between Malco and Maljamar, but all of these have been eliminated by subsequent events and the parties are in agreement that the only issue, aside from the jurisdictional question, remaining in the case is the price which Malco was required to pay and which Maljamar was entitled to receive for the oil which was delivered to Malco prior to February 16, 1946.

At the outset, a question of jurisdiction is presented. Maljamar contends that a realignment of the parties according to their true interest in the litigation estab-

lishes a community of interest as parties plaintiff between Malco, a New Mexico corporation, Murchison and Company, a Delaware corporation, and Ernest Closuit, a citizen of Texas, which aligns them as parties plaintiff against Maljamar, another Delaware corporation, and thus destroys diversity of citizenship upon which the jurisdiction of the court depends. It is true, as asserted by Maljamar, that Murchison's answer admits the allegations of Malco's complaint as to the execution of the contracts, and that it joins with plaintiff in seeking to maintain the validity of the base contract, together with the amendment thereto. But that in itself does not establish such community of interest as will align Murchison with Malco as a party plaintiff for the purpose of determining the jurisdiction of the federal court. The contracts in question are trilateral in nature, in which each of the parties has and asserts separate and distinct rights and liabilities against the other. Malco claims the right to purchase Maljamar's oil at a flat price, based on thirty-six degree gravity oil. Murchison has no interest in this controversy. Murchison, on the other hand, claims as against Malco the right to transport all of the oil that it purchases, whether purchased from Maljamar or from other producers. Maljamar has no interest in this controversy. On the other hand, Murchison also claims as against Maljamar the right to purchase its surplus production above Malco's requirements. Malco is not interested in this controversy. Each of the parties seeks to protect for itself and not for any of the other parties its own peculiar rights under the tripartite agreement. The fact that Malco and Murchison both seek to uphold the validity of the contract does not align them as parties plaintiff because there is no community of interest in the rights which each claims under the contract against Maljamar. We accordingly conclude that there was diversity of citizenship, and that the court had jurisdiction.[6]

The trial court made appropriate findings of fact and conclusions of law. It held as a matter of law that the base contract, together with the supplemental contracts of July 28, 1938, and of July 11, 1940, together with the contract of December 30, 1941, in which Maljamar agreed to sell all its oil production to Malco until December 31, 1951, together with the letter dated December 30, 1941, constituted a valid and enforceable contract between Malco and Maljamar which required Maljamar to sell all its oil from designated leases to Malco and obligated Malco to pay for such oil at posted price for oil of thirty-six degree gravity, whether the actual gravity of oil was greater or less than thirty-six degree gravity; that in the event Malco did not purchase all of Maljamar's production, Murchison had the right to purchase such excess on terms concerning which there is no dispute. As to the separate issues between Malco and Murchison, the court concluded that Murchison had the exclusive right to transport all oil used by Malco's refinery until December 30, 1942.[7]

Maljamar's main contention is that the contracts or writings which the court found constituted valid contract are unenforceable in New Mexico, because they violate the statute of frauds in that they are not completely reduced to writing, and that parol testimony was necessary to establish the terms and provisions thereof.

■■ It is first necessary to determine whether the contract of December 30, 1941, and the letter of the same date between Maljamar and Malco is a New Mexico or New York contract. As pointed out, the contract of December 30, 1941, was executed in fulfillment of Maljamar's undertaking in the contract of December 29, 1941, by which Malco was sold to new owners. In fact, the contract of December 29, 1941, the contract by Maljamar of December 30, 1941, and the letter of December 30, 1941, were all integral parts of a single transaction resulting in the sale of the refinery. The sale of the refinery was not complete until the contract and the letter of December 30, 1941, were executed, and the sale would not have been consummated without them. There is no dispute as to the facts attending the execution of the

---

[6] See Franz v. Franz, 8 Cir., 15 F.2d 797, and cases cited therein.

[7] This date is evidently in error, because the extended transportation contract runs until December 31, 1951, but this is not an issue in the case.

contract and the letter of December 30, 1941. The court found that the letter was signed and delivered in Chicago, Illinois, but that the contract was executed by Maljamar's president and the seal of the corporation was affixed thereto in New York City, New York. Until this was done, the contract was not complete and no deal had been consummated. The letter was a part of the contract and must be construed as a part thereof. We accordingly conclude that the contract is a New York contract.

New Mexico has not adopted a Statute of Frauds, but its courts hold that the English Statute of Frauds [8] is in force by virtue of the adoption of the Common Law of England. 1941 Comp.N.M. § 19-303. It has been held that the English Statute is remedial and not substantive.[9] Maljamar accordingly contends that the English Statute of Frauds as applied in New Mexico, rather than the statute of New York, Personal Property Law, Consol.Laws, c. 41, § 31, determines the right to maintain this action. The courts are in hopeless conflict on whether the Statute of Frauds is substantive or remedial. This conflict extends to the interpretation of language identical with that of the English Statute, as well as to language identical to that of the New York Statute. No useful purpose would be served in analyzing the conflict in the decisions.

In our opinion, however, it is not necessary to determine whether the New Mexico Statute of Frauds applicable to a contract for the sale of goods or commodities is substantive or procedural, or even whether the New Mexico or the New York statute controls, because in either event the decision must be the same.

Under the New York decisions, the writings in question constitute a complete written contract, and take the contract out of the Statute of Frauds. In Marks v. Cowdin, 226 N.Y. 138, 123 N.E. 139, 140, the Court of Appeals of New York considered a set of facts indistinguishable from the facts in this case in principle, and concluded that the writings there constituted a completed written contract and that the Statute of Frauds did not apply. In that case Marks was employed as general manager of a corporation. The corporation wrote him that his employment was to continue for two years. At the end of that time his employment was continued by oral arrangements for three years more. Shortly after the oral extension, difficulties arose, and Marks requested a written memorandum of his employment. The company thereupon wrote him the following letter: "It is understood between Johnson Cowdin & Co. and Leon Marks that the arrangements made for employment of Leon Marks in our business on January first, 1913, for a period of three years from that date at a salary of * * * continues in force until Jan. 1st, 1916."

The question in that case was whether the letter was a sufficient writing to take the contract of employment out of the statute of frauds. The court held that it constituted a complete contract and left no terms or provisions of the contract to be established by parol testimony. In the course of the opinion, Judge Cardozo stated: "It assumes the existence of a position which the plaintiff is then filling. It says that the employment shall be continued for a term and at a salary prescribed. A position then held is carried forward and preserved. The tests to be applied in order to identify the employment are thus embodied in the writing. We are not left to gather the relation between the parties from executory promises. * * * If A. agrees to sell to B. 'the house and lot now occupied by the seller,' the description is not void because the bounds of occupation must be established

---

[8] Section 4 of the English Statute of Frauds, 29 Car. II, c. 3 (1677), provides that no action shall be brought on the class of cases therein set forth unless the transaction be in writing. Section 17, however, provides that no action on contract for the sale of any goods, wares and merchandise, etc., "shall be allowed to be good." It has been held in England that Section 4 is remedial, but Section 17 is substantive. See C.J., Frauds, Statute of, vol. 27, § 3, p. 125, and cases cited; 37 C.J.S., Frauds, Statute of, § 3. However, the Sale of Goods Act of 1893, 56 and 57 Vict. 71, provides that a contract for the sale of goods "shall not be enforceable by action unless * * *."

[9] Brooks v. Yarbrough, 10 Cir., 37 F. 2d 527.

by parol. \* \* \* It is not otherwise where A. agrees with B. that a position in A.'s service then held shall be continued. 'I will keep you until January 1, 1916, at so much a year, in your present place.' By necessary implication, by inevitable construction, that is what this memorandum says. It makes no difference whether the place is land to be occupied or a relation of employment to be filled. Whether it is one or the other, we do not violate the statute, when we fit the description to the facts. In thus identifying the position we are not importing into the contract a new element of promise. We are turning signs and symbols into their equivalent realities. This must always be done to some extent, no matter how many are the identifying tokens."

As in the Marks case, so here the parties were dealing with an existing relationship. They had an established price practice which had been in effect between them without interruption from the inception of their relationship until the time of the execution of this contract. When the parties agreed in writing that they "will continue to pay for such crude oil as you buy from us out of the Maljamar pool on the same price practice as heretofore in vogue," they were dealing with a reality—with an established practice, and bringing it out in detail by establishing by parol testimony what this practice was, no more imported a new element into their contractual relationship than developing a negative brings into the portrait new elements not existing in the negative itself.

■ In Hoadly v. McLaine, 10 Bing. 482, 131 Eng.Reprint 982, the English courts considered a contract in which the parties sought to be charged had agreed in writing to construct a new landaulet. The price was not mentioned. Nevertheless, the court held that the writing was sufficient to satisfy the English statute of frauds. Chief Justice Tindal said: "It is clear that a contract for the sale of a commodity in which the price is left uncertain is in law a contract for what the goods shall be found to be reasonably worth \* \* \* *What is*

*implied by law is as strong to bind the parties as if it were under their hand."* [10]

In that case, the contract was entirely silent as to the price. Here the contract is much stronger, in that it mentions the price as established by an existing relationship. It is our view that under the English decisions in force in New Mexico, as well as under the decisions of New York, the contract constitutes a complete and sufficient writing to take it out of the statute of frauds, and that under the law of either New Mexico or of New York an action thereon will lie.

■ Malco continued to pay a flat price, based on thirty-six degree gravity oil, long after other purchasers of crude oil had posted prices on the basis of actual gravity up to forty degrees, and Maljamar continued to accept payment on that basis without protest long after its ownership of Malco had ceased. The first protest by Maljamar was contained in its letter of June 13, 1944, more than two years after arm's length dealings between Maljamar and Malco. This amply sustained the trial court's conclusion of law that the contract obligated Maljamar to sell its oil to Malco and obligated Malco to pay therefor at posted price for thirty-six degree gravity oil, irrespective of the actual gravity thereof.

■ Finally, Maljamar contends that the contract of July 11, 1940, in which Murchison ratified the extension of the base contract to July 31, 1949, is void for want of consideration. It is argued that the contract of July 28, 1938, already required Murchison to carry the Maljamar oil to the refinery until July 31, 1949, and that therefore Murchison was giving nothing additional when it attempted to bind itself to do the same thing. The fallacy of this argument is apparent on its face. The base contract required Maljamar to deliver all its oil to Murchison for transportation to Malco for ten years. As pointed out, this was a contract between the producer, the pipeline, and the refinery. It expired at the end of the ten year period. It could be extended effectively, so as to bind all three parties, only if the extension were execut-

---

[10] Emphasis supplied.

ed and ratified by the same three parties to the original contract. The contract of July 11, 1940, recites that it was intended that Maljamar was to join in the extension of the base contract. This would be adequate consideration for the execution of this contract. In the face of this positive declaration of consideration for its execution, we are not called upon to speculate as to why Maljamar did not join in the original extension or why it did not contain a place for Maljamar's signature. Neither are we impressed with the argument that Murchison as a common carrier was already bound to carry this oil and that therefore there was no consideration for the extension contract. Assuming, without deciding, that Murchison is a common carrier, there is no showing that its obligations and rights as such are the same or identical with those established by the extension contract.

A careful examination of the record and the briefs leads us to conclude that the judgment should be, and it is accordingly,

Affirmed.